IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| JOANNE PEARSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 4:11-CV-1846-RRA |
| ) | |
| TRAVELERS INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

The case is before the court on the plaintiff's motion for summary judgment on the defendant's arson defense. (Doc. 49.) All claims arise out of the plaintiffs claim for payment on her homeowners policy after two fires destroyed her home. The defendant has refused to pay, claiming in part that the plaintiff burned down her own home.

STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary

judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. See Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Barfield v. Brierton, 883 F.2d 923 (11th Cir. 1989).

FACTS[1]

Joanne Pearson was the named insured under a Travelers High Value Homeowner's Policy issued by Travelers for the home located at 205 Roseland Drive, Rainbow City, Alabama 35906. The policy had effective dates of December 14, 2009 through December 14, 2010. On or about April 19, 2010 the home suffered a fire loss. By the time the fire

---

[1]These facts are set out, as this court must, in the light most favorable to the non-movant. The court notes that many of the non-movant's proffered facts were disputed by the movant, without a citation to the record. The court's summary judgment scheduling order specifically provides:

> Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based. All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.

(Doc. 8, p. 9) (emphasis in original). Those facts which were disputed by the movant in this manner have been deemed to be admitted. Further, many facts are offered by the movant with a general reference to evidence, without specific page numbers. For example, in document 49, at page 5, the plaintiff sets out her fact number 4 and cites generally to Exhibit 8, the deposition of Ted Alexander. The court should not have to guess which portions of the deposition support these facts. When the plaintiff has cited in this manner that fact has been omitted by the court. Similarly, where the plaintiff's citation is more specific, yet still does not support the fact as stated, that fact has been omitted.

units arrived on the scene on April 19, 2010, the fire had extinguished itself. A second fire was discovered at the same home around 1:00 a.m. on Thursday, April 22, 2010. The April 22, 2010 fire was a fully involved fire.

Pearson made a claim under her insurance policy with Travelers. After an investigation, Travelers denied Pearson's claim:

> Our investigation revealed misrepresentations and/or concealment of material facts were made to us by you during the submission, investigation and evaluation of the fire claim thereby breaching the Concealment or Fraud provision of the insurance contract. There is also evidence that you intentionally caused or procured this loss by arson, breaching the Intentional Loss provision of this policy.

(Doc. 54-13, p. 41.)

In denying the claim, Travelers relied upon the complete investigation by Travelers' fire and SIU units. When asked to itemize all facts and circumstances which caused Travelers to conclude that the plaintiff caused the fire in question. Travelers responded on 1/14/12 that Pearson had a strong financial motive and opportunity:

> 1. Plaintiff has a strong financial motive to cause the fire as evidenced by the following:
>
> a. Plaintiff's bank records;
> b. Plaintiff was unemployed on the date of loss and had been for several years;
> c. Plaintiff's documented monthly expenses exceeded her monthly income;
> d. Plaintiff had outstanding tax liens held by the IRS and the Alabama Department of Revenue;
> e. Plaintiff had an outstanding Default Judgment against her;
> f. Plaintiff claimed to had (sic) $150,000 cash in her home at the given time of the fire. However, following the first fire, when given the opportunity to retrieve anything from the home, Plaintiff testified she only retrieved a jar of coins.
> g. Plaintiff listed her home for sale during 2009 but was unable to sell it, even after dropping the listing price.
>
> 2. Plaintiff had the opportunity to cause the fire as evidenced by the following:

>   a. With respect to the first fire, Plaintiff was the one who discovered the self-extinguished fire on April 19th. She was alone at the time, and had been the last one in the home. According to Plaintiff, she left the home on Friday, April 16th, and secured it. She returned to the property on Sunday, April 18th, but did not enter the home.
>   b. Plaintiff's daughter testified that Plaintiff left her daughter's home Wednesday, April 21st and she believed she returned around 1:00 a.m. Plaintiff denied having returned to her home at all after Monday, April 19th; however, Mack Butler, a neighbor of Plaintiff, stated that Plaintiff's vehicle was seen in her driveway on Wednesday evening on April 21st around 6:00 p.m. When the fire department was present extinguishing the fire, Butler stated he did not see Plaintiff's vehicle at that time as it had been earlier.
>   c. Further, Mack Butler's father-in-law, Don Garrett, stated that Plaintiff was seen loading vases, pictures, and other objects into her red Corvette sometime during the daylight hours after the first fire, but before the second fire.

(Doc. 49-7, pp. 2-3.)

### April 18, 2010

Pearson testified that she returned to her home with her three-year old grandson on Sunday, April 18, 2010, to make sure the water to her pool was turned off. Pearson stated that she did not go into the house or garage, but simply walked outside to the pool to check the water. She was driving her red Corvette. Pearson does not believe she was at the house for more than ten minutes checking the pool on the Sunday, April 18, 2010 trip. Pearson was very adamant that she did not go inside her house or garage on that Sunday. She testified that she did not take anything out of the house or put anything into her Corvette on this visit.

### The April 19, 2010 Fire

The week prior to the first fire, Pearson stayed with her daughter, Brittany Lettau. On April 16, 2010, Pearson went to her home and met her friend Emily sometime early in the

4

day. According to Pearson, she left her home after five o'clock that Friday evening and secured the home when she left. She got into a bar fight on that night, did not feel comfortable staying in her own house, and instead stayed with her daughter Brittany all weekend. According to Pearson she spent Sunday night at Brittany's house.[2]

On the date of the first fire, April 19, 2010, Pearson returned to the house and entered through the garage door. When Pearson entered the house on the main level, she heard water running and noticed "fall out" on the furniture and items in her house. At this time, she called the fire department. Before the firemen arrived, Pearson stood outside the home. She did not walk through the house to determine if anything was damaged.

After surveying the scene of the first fire in the basement/storage area of the home, Chief Potter of the Rainbow City Fire Department opined that the first fire was accidental and possibly[3] caused by an overturned lamp. The fire department also concluded that the fire melted PVC pipes which caused them to burst and the water extinguished the fire.

The fire department next contacted the power company and had the power to the home turned off. According to Pearson's billing records from Alabama Power, the power was turned off on April 19, 2010. Additionally, to ensure that there were no hot spots, the fire department brought in a thermal imager in order to rule out any possible areas of heat which could cause a rekindle. Chief Potter walked through the home and discovered any smoke or

---

[2]The plaintiff objects to the information in this paragraph and states that she will file a motion in limine. (Doc. 63, p. 3.) The court is unaware of any such filing.

[3]The plaintiff objects to the use of the word "possibly," but she does not explain her objection.

signs of fire. The home was secured by locking all doors. Pearson stated she then went back to her daughter Brittany's home and never returned to the house.

### April 21, 2010

Mack Butler lived next door to the Pearson home and is a reserve Sheriff's Deputy for Etowah County. According to Butler, on Wednesday evening, April 21, 2010, when he came home from work, he noticed Pearson's white truck in the driveway. Later, after being awakened due to the second fire, Butler noticed that Pearson's white truck was no longer in the driveway.[4]

Don Garrett is Butler's father-in-law. Garrett was at Butler's home on Wednesday, April 21, 2010. While Garrett was there, he observed Pearson come in and out of her home carrying pictures, "hand stuff," and lamps to her red Corvette. (Doc. 60-13, pp. 5(16).) In addition, neighbors testified that the Pearson home appeared as if no one was living there.

### The April 22, 2010 Fire

The second fire at Pearson's home was discovered around 1:00 a.m. on Thursday, April 22, 2010 by neighbors who called 911. On Thursday, April 22, 2010, Pearson's daughter Brittany was contacted by the police and asked where Pearson was. Brittany then called Pearson on the afternoon of Thursday, April 22, 2010 and informed her that her home had caught fire. Pearson testified that she then went to her home.

---

[4]The court has omitted the defendant's facts regarding the contents of the videotape which Butler had of the Pearson home. The tape is unavailable. The testimony is hearsay.

In responding to the second fire, members of the Rainbow City Fire Department arrived with the home fully involved in fire. The fire chief went to the area of the home where the first fire occurred and saw no flames.

Investigations of the April 22, 2010 Fire

Chief Melvin Potter

Chief Potter ruled out rekindle as a cause of the first fire, as, in his experience, a rekindle is not possible after three days. Additionally, when Chief Potter conducted his examination of the second fire, he noted that the gas and the power were turned off at the home. After eliminating that possible cause of the second fire, Chief Potter thought that the second fire was "suspicious" because the circumstances were "not normal." (Doc. 54-21, p. 16(63-64).) Chief Potter testified that in his personal opinion "there was no accidental cause" for the second fire. (Doc. 54-21, p. 18(69).) Potter formed this opinion by ruling out other causes of the fire. "Ruling out" is a common method in fire investigation.[5] In his deposition, he testified that he does not have any reason to believe that Pearson caused the fire. (Doc. 54-21, p. 21(84).)

Alabama State Fire Marshal

The Alabama state fire marshal also investigated the second fire. A K-9 accelerant-detection dog alerted on several locations within the confines of the building.

---

[5]The plaintiff disputes these last two sentences without citation to the evidence. The plaintiff merely writes " Denied. Chief Potter's testimony is as follows:" without anything more.

7

Rod Williams

Rod Williams, with EFI Global, was retained by Travelers and conducted an independent investigation in order to determine the origin and cause of the second fire. Williams is a Certified Fire Investigator, Certified Fire and Explosion Investigator, and a Certified Vehicle Fire Investigator.  Upon inspection of the scene of the second fire, Williams detected the odor of gasoline. On May 21, 2010, Williams prepared and submitted a report to Travelers.  The report stated:

> Fire pattern analysis and witness statements indicate that the fire originated on the west side of the structure. The level of the origin could not be determined due to the extent of damage. The damage precluded determining the circumstances or events bringing ignition and materials together…

(Doc. 49-3, p. 6.)

> The investigation did not identify an area of origin. The ignition source was not identified and the cause of the fire is undetermined. The investigation is on-going. Fire department incident reports are enclosed.

(Doc. 49-3, p. 9.)

> Fire pattern analysis and witness statements indicate that the fire originated in the southwest portion of the structure; although the level at which the fire originated could not be determined. The fire department states that on arrival, the entire upper floor was involved and the roof was beginning to collapse. They also state that there was no fire coming out of the windows on the main level; indicating that the fire possibly originated on the upper level of the structure. The extent of damage precluded making that determination, as well as the circumstances/events bringing ignition and materials together.
>
> The classification of this fire is undetermined.

(Doc. 49-3, p. 11.)

Williams later provided a supplemental report.  After continuing his investigation, which included interviews with witnesses, Williams issued a supplemental report to Travelers

8

on March 15, 2012, which contained his determination that the cause of the second fire was incendiary. His opinion in the supplemental report was the result of the elimination of all other possible causes.

## Bob Boteler

On April 24, 2010, Travelers referred the investigation of the second fire to Bob Boteler, a fire investigator with Travelers Fire Investigation Unit. Boteler is trained in the investigation of the origin and cause of fires and has been conducting such investigations for over 30 years. Upon conclusion of his investigation, Boteler opined in a December 15, 2010 report:

> The second fire originated in the middle section of the residence and at this time my investigation indicates that it was the result of human intervention. Our investigation continues.

(Doc. 60-11, p. 19.)

On March 27, 2012, Boteler submitted his "Fire Investigation Report/Forensic Origin and Cause Determination" as part of the defendant's disclosure of experts. In summary, Boteler opined:

> Fire patterns, witness accounts, and the fire dynamics indicate that the fire originated in the midsection of the structure. The cause of the fire in the middle section was the result of human intervention. Electrical causes, a rekindle and lightning were affirmatively addressed and eliminated.

(Doc. 60-11, p. 40.)

Brittany Lettau

According to Pearson's daughter, Brittany Lettau, on Wednesday, April 21, 2010 her mother left Brittany's house that evening to go out. Brittany believes Pearson came home to Brittany's house that same night no later than midnight.

Background of the Home Insured by Travelers

Pearson and her husband purchased the home, she believes for $450,000, with a 15-year mortgage. Pearson's husband, Dr. Pearson, passed away in April 2009. Pearson had a prior marriage to Edward Charles Lettau. They were married until Lettau passed away in 1989. Pearson listed the home for sale with ERA Realty. After a period of time went by and the house had not sold, she lowered the price. The home still did not sell, and the contract with the realtor expired. A few months before the fires, Pearson took the home off the market. At the time of the fire, Pearson and Brittany had a key to the home. Pearson claims she never found the key Dr. Pearson had before his death, and the key she gave to her realtor is missing.

Pearson's Income

Pearson is currently unemployed and was unemployed at the time of the fires at her home. She last worked at a local restaurant in the kitchen over three years ago.

At the time of the second fire, Pearson was drawing approximately $1,500 in social security benefits. The social security income was comprised of $1000 from the death of Dr. Pearson and $500 due to the plaintiff's disability. She also received $300 a month from the

rental of a home she owns in Dillon, South Carolina. Pearson also testified that she received income in the form of royalties from the use/sale of photographs taken by her late husband Lettau. She stated that this income fluctuates. In the months leading up to the fire and the months afterward, there was no evidence in Pearson's bank statements of any income from this source.

Pearson also testified that she is a cosmetologist, and that in the year 2009-2010 she made about $12,000. The plaintiff also received about $150,000 from life insurance policies on Dr. Pearson, which she used to pay bills. She also received other money from Dr. Pearson's death which she used to pay bills. At the time of the second fire, Pearson had no expectation of receiving income from any other source.

### Pearson's Expenses and Bank Accounts

At the time of the fires all of Pearson's bank accounts were with Wachovia. After Dr. Pearson's death, Pearson set up an account for his estate, but by the end of April 2010, the account was down to $273.27. Pearson also had a money market account with Wachovia from which, at the end of October 2009, she withdrew $15,763.78. At the end of November, 2009, this account had a balance of $365.83; at the time of the fires in April 2009 that amount had not changed.

Pearson had as her primary account, a Crown Classic banking account. Pearson put the $15,763.78 she withdrew from her money market account into this account in October, 2009. The balance of Pearson's main account at the end of November 2009 was $9,073.68. From December 2009 thru September 2010, with the exception of a deposit of $50,579.78

(from an AARP life insurance policy from her deceased husband), the balance of this main account steadily declined from a closing balance of $45,801.77 on February 24, 2010 to a closing balance of $25,009.06 on or about the date of the second fire, which amount further decreased to a closing balance of $3,179.53 on September 24, 2010. On January 5, 2009, Wachovia sent the Pearsons a letter stating that the mortgage was in default for failure to pay several months of mortgage payments. After Dr. Pearson passed away, the plaintiff stated she paid to Wachovia around $50,000 at one time, despite her contention that the mortgage was not delinquent.

Before the fires, Pearson had attempted to refinance the home in order to lower the mortgage payments. In October of 2009, Wells Fargo (which was once Wachovia) references a communication with the debtor, presumably the plaintiff, since Dr. Pearson was deceased, regarding a possible loan modification. In September of 2009, Pearson was sued by CitiFinancial Corporation, and a default judgment was obtained against her in the amount of $10,000. Pearson testified that she did not have any savings, investments, or CDs.

With respect to the fixed monthly or annual expenses, the following is a chart outlining Pearson's expenses based on her testimony and bank records.

| Creditor | Monthly Payment | Description |
|---|---|---|
| Wachovia/Wells Fargo Mortgage | $3703.98 | (Pearson Dep. 263:10-13) |
| Utilities Board | 75.00 | This includes water and garbage. (Pearson Dep., Ex. 1 at 187). |
| Power Bill | 222.62/352.11 | Jan. 2010 and Feb.. 2010 payments. (Pearson Dep. Ex. 8). |

| | | |
|---|---|---|
| Cable/Internet | 113.23 | (Pearson Dep. Ex. 8) |
| Cell Phone | 75.00 | (Pearson Dep. Ex. 8) |
| Homeowners Insurance | 884.33 | Pearson paid this on her own, as it was not part of her mortgage escrow. (Pearson Dep. 232:14-233:3). |
| Auto Insurance | 622.31 | Monthly payment for all cars. (Pearson Dep. 232:2-13). |
| Gas Bill | 308.80/498.23 | Jan. 2010 and Feb.. 2010 payments. (Pearson Dep. Ex. 8). |
| Additional Home in Gadsden on Hardin Circle. At the time of the fire, no one was renting this home. | $678.00 | Pearson Dep. 87:8-16 |
| TOTALS: | $6683.27/ 7002.19 | |

Before the fires, Pearson also made periodic payments on life insurance policies for herself or her daughter. Those policies have since lapsed. She also had to pay her property tax on March 1, 2010 in the amount of $896.49. Pearson stated that her monthly expenses exceeded her monthly income, but that she had money at her house. Pearson claims to have $150,000 cash in the home at the time of the fires. Following the first fire, she retrieved nothing from the home but a jug of coins.

Pearson also testified that her previous husband, Lettau, left her a sizeable estate, including cash, art, antiques, and photos. Pearson stated that she spent the cash, including $50,000 which she used for the down payment of the burned home at issue.

Pearson testified at her Examination Under Oath that she was aware of an Alabama

Department of Revenue state tax lien for the tax period of 2007, for unpaid tax in the amount of $2,467.10. There was an Alabama Department of Revenue Notice of August 24, 2009 indicating this. There was also a federal IRS tax lien of $20,218.86, with a notice dated June 11, 2009. Pearson stated that she filed jointly with Dr. Pearson in 2006 or 2007, and that was the last time she filed taxes.

Diane Morelli, Lettau's daughter by a prior marriage, testified that there not much left after her father passed away and it is unlikely that he left much cash.

## ANALYSIS

In her brief the plaintiff quotes Alabama Pattern Jury Instruction 20.58 regarding the defense of arson. (Doc. 49, pp. 1-2.) She also quotes the following language from Hollis v. Brock, 547 So. 2d 872, 873 (Ala. 1989):

> As to the Hollises' claim against Brock, they produced evidence that she was having some financial difficulty with the florist shop she ran in the Edwards building, and they claim that this evidence of a motive for arson is a scintilla of evidence of the act of arson. However, the Hollises produced no evidence of how or where the fire started and no evidence that Brock had anything to do with the starting of the fire. "Speculation and conclusory allegations are insufficient to create a genuine issue for trial." Bogle v. Scheer, 512 So.2d 1336, 1340 (Ala.1987). The trial court was correct in granting Brock's summary judgment motion.

Hollis v. Brock, 547 So. 2d 872, 873 (Ala. 1989) (cited by the plaintiff at document 49, p. 3.)

The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. See Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991); Fed.

R. Civ. P. 56(a). In the argument section of her motion, as well as in her reply brief, the plaintiff does not set out any law or engage in any substantive argument. For this reason alone, the plaintiff's motion for judgment in her favor on the defendant's claim of arson should be denied. Moreover, the cases do not assist the plaintiff.

The Hollis case was not an arson defense case, and it does not set out the standard to prove such a defense. The Eleventh Circuit, citing Alabama law, has set out the standard in Fondren v. Allstate Ins. Co., 790 F.2d 1533, 1535 (11th Cir. 1986). The court stated:

> To establish an arson defense under Alabama law, an insurer must " 'prove by competent and relevant evidence arson by someone, motive by the plaintiff and unexplained surrounding circumstantial evidence implicating the plaintiff.' " Mueller v. Hartford Insurance Co., 475 So.2d 554, 557 (Ala.1985) (quoting Great Southwest Fire Insurance Co. v. Stone, 402 So.2d 899, 900 (Ala.1981)). The insurer's burden of proof is not particularly heavy. Proof may be made by circumstantial evidence "if the inferences are not too remote and all circumstances, including the inferences, are of sufficient force to bring minds of ordinary intelligence to a persuasion of incendiarism by a fair preponderance of the evidence." Id. Proof beyond a reasonable doubt, or proof by direct evidence, is not required.

Fondren v. Allstate Ins. Co., 790 F.2d 1533, 1535 (11th Cir. 1986).

In Fondren, the court found sufficient evidence arson by someone in the form of

> testimony from two fire investigators who found three separate points of origin for the fire and burn patterns indicating use of an accelerant, and who were able to rule out all possible causes other than arson. In addition, carpet samples taken from the house after the fire were found to contain lighter fluid or a similar petroleum distillate.

Fondren, 790 F.2d at 1535. The court also found evidence of motive, stating that "the Fondrens were in extremely poor financial condition and that they had been planning to move to Mississippi but had been unable to sell their Centreville home." Id. at 1535. Last, the court wrote:

> Evidence particularly implicating the Fondrens came largely in the form of

>testimony from a Centreville police officer. He testified that at about the time of the fire he observed Mr. Fondren in his car sitting by the side of the highway near the house. According to the officer, Mr. Fondren then circled the house in his car several times at five to ten miles per hour. When the officer arrived at the house after speaking with Mr. Fondren he observed Mrs. Fondren walking out of a nearby cornfield. Neither Mr. nor Mrs. Fondren ever attempted to contact the fire department. Testimony from a neighbor put the Fondrens' car or a similar vehicle in their driveway a few hours before the fire, possibly contradicting the Fondrens' testimony that they were away. It was undisputed that the Fondrens were the last to leave the house, had complete access to it, and were nearby when the fire was first observed.

Id.

In the instant case there is evidence that the K-9 dog alerted several times for accelerant. Williams ruled out all causes of the second fire except incendiary. Boteler determined that the cause of the fire was human intervention. Chief Potter opined that the fire was not accidental. Butler saw the plaintiff's car at the house shortly before the fire. Garrett saw Pearson removing items from the home after the first fire. The plaintiff was the last person in the house, and there is no evidence that anyone had access to the house other than the plaintiff. There is substantial evidence that the plaintiff was in financial distress: there were tax liens, she could not sell her house, there was a default judgment against the plaintiff, and her expenses exceeded her income. The plaintiff has not come close to establishing that she is entitled to judgment as a matter of law on the defense of arson.

## RECOMMENDATION

Based upon the foregoing it is RECOMMENDED that the plaintiff's motion for summary judgment be DENIED.

Any party may file specific written objections to this report and recommendation

within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action. If objections are filed, the opposing party has ten (10) additional days to file a response to the objections.

    DONE this 25th day of March, 2013.

                                            Robert R. Armstrong, Jr.
                                            United States Magistrate Judge