## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **JOANNE PEARSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:11-CV-1846-VEH** |
| | ) |
| **TRAVELERS HOME & MARINE** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

This matter is before the Court on the Objections (doc. 90) of the defendant, Travelers Insurance Company("Travelers") to Magistrate Judge John H. England, III's report and recommendation (the "R & R") (doc. 89), which recommends that Traveler's Motion for Summary Judgment (doc. 60) be granted as to the bad faith claim against it and otherwise be denied.[1] The plaintiff, Joanne Pearson ("Pearson") has responded (doc. 91) in support of the R&R.

Travelers' Motion for Summary Judgment (doc. 60) was filed on July 30, 2012. In opposition, Pearson filed a Response (doc. 62) on August 9, 2012, a Brief (doc.66) on August 14, 2012, and a Brief re Brief (doc 71) on August 20, 2012. Travelers replied

---

[1] The parties have not consented to the jurisdiction of the magistrate judge. Therefore, in accordance with 28 U.S.C. § 636(b), the magistrate judge entered a report and recommendation.

(doc. 74) to these oppositions on September 4, 2012. The R&R (doc. 89) was entered on July 2, 2014. Travelers' Objections (doc. 90) were filed on July 16, 2014. Pearson's Response (doc. 92) to Travelers' Objections was filed on July 24, 2014.  This case was reassigned to the undersigned judge on July 30, 2014. The matter therefore is under submission.

For the reasons stated herein, the magistrate's recommendation is **ADOPTED** to the extent that it is consistent with this memorandum opinion, and to the extent to which no objections were made. To the extent that the objections are inconsistent with this opinion, they are **OVERRULED**. The magistrate's conclusions that questions of fact remain as to whether the plaintiff committed or directed the commission of arson and as to whether the plaintiff possessed an intent to deceive when she misrepresented as to material facts in her policy claim are not adopted.  The defendant's objections to those conclusions are **SUSTAINED**.  Summary Judgment will be **GRANTED** to the defendant by separate order.


I.    **STANDARD**

   A.    **Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment

as a matter of law. Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).   The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id*. at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id*.

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the evidence

presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id*. at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting affirmative evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id*. (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id*. (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.   *Id*. at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id*. at 1116.  In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

### B.   District Court Review of Report and Recommendation

After conducting a "careful and complete" review of the findings and recommendations, a district judge may accept, reject, or modify the magistrate judge's report and recommendation.   See 28 U.S.C. § 636(b)(1) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."); *Williams v. Wainwright*, 681 F.2d 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982), overruled on other grounds by *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996)).   The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

A district judge "shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citing H.R. Rep. No. 94-1609, 94th Cong., 2nd Sess., reprinted in 1976 U.S. Code Cong. & Admin. News 6162, 6163). In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 Fed. App'x. 781, 784 (11th Cir. 2006).

"Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct." *United States v. Woodard*, 387 F.3d 1329, 1334 (11th Cir. 2004) (internal quotation marks omitted) (quoting *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)). It is incumbent upon the parties to timely raise any objections that they may have regarding a magistrate judge's findings contained in a report and recommendation, as the failure to do so subsequently waives or abandons the issue, even if such matter was presented at the magistrate judge level. See, e.g., *United States v. Pilati*, 627 F.3d 1360 at 1365 (11th Cir. 2010) ("While Pilati raised the issue of not being convicted of a qualifying offense before the magistrate judge, he did not raise this issue in his appeal to the district court. Thus, this argument has been waived or abandoned by his failure to raise it on appeal to the district court."). However, the district judge has discretion to

6

consider or to decline to consider arguments that were not raised before the magistrate judge. *Stephens v. Tolbert*, 471 F.3d 1173, 1176 (11th Cir. 2006); *see also Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("Thus, we answer the question left open in Stephens and hold that a district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.").

"Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." Id. at 410. Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Williams*, 557 F.3d at 1292 (internal quotation marks omitted) (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).


## II.    FACTS

Neither party has made objections to the magistrate's findings of fact. The court finds that the following facts, which are set out in the R&R, and to which no objection has been made, are not clearly erroneous:

Pearson was the named insured under a High Value Homeowner's Policy ("Policy") issued by Travelers for a home located at 205 Roseland Drive, Rainbow City, Alabama

35906 ("the home"). (Doc. 60-2, Policy). The policy has effective dates of December 14, 2009 through December 14, 2010, and states in pertinent part as follows:

### SECTION I - EXCLUSIONS
\* \* \*

8. **Intentional Loss**
   We do not provide coverage for any loss arising
   out of any act committed by or at the direction of
   an "insured" with the intent to cause a loss. . . .

(Doc. 60-2 at 44, Endorsement HV-300 at 2).

### SECTION I - CONDITIONS
\* \* \*

18. **Concealment of Fraud**. We provide coverage to
    no "insureds" under this policy if, whether before
    or after a loss, an "insured" has:
    a.    Intentionally concealed or misrepresented any material fact
          or circumstance;
    b.    Engaged in fraudulent conduct; or
    c.    Made false statements;
    related to this insurance.

(*Id.* at 32, Policy at 18).

On or about April 19, 2010, the home suffered a fire loss. (Doc. 60-17 at 14-15). By the time the fire units arrived on scene, the fire had self-extinguished. (*Id.* at 17). A second fire was discovered at the home around 1:00 a.m. on Thursday, April 22, 2010. (*Id.* at 16). The April 22, 2010 fire was fully involved, resulting in nearly total destruction of the home. (*Id.* at 51). As a result of the fire loss, Pearson made a claim under her Policy with Travelers. (Doc. 60-4 at 8).

**The Home Insured by Travelers**
Pearson and her husband purchased the home for $450,000, with a fifteen year mortgage. (Doc.60-5 at 104 (EUO)). Pearson's husband, Dr. Pearson, passed away in April 2009. (Doc. 60-5 at 51-52). Pearson was previously married to Edward Charles Lettau ("Mr. Lettau"). (*Id.* at 97). They were married until Mr. Lettau passed away in 1989. (*Id.*).

Sometime after Dr. Pearson passed away in 2009, Pearson listed the home for sale. (*Id*. at 286). Pearson listed the home with ERA Realty, but after a period of time passed and the home did not sell, the realtor suggested lowering the price. (*Id*. at 287). When the home still did not sell after lowering the asking price, the agent suggested Pearson again lower the price, and Pearson refused. (Doc. 60-5 at 289). The contract with the realtor eventually expired, and Pearson took the home off the market later in 2009. (*Id*. at 290).

At the time of the fires, only Pearson, her daughter, and perhaps the real estate company had keys to the home. (*Id*. at 315-16). The home had an ADT monitored fire/smoke alarm system, but, several months prior to the fire, it was disconnected and was no longer being monitored at the time of the fires. (*Id*. at 344-45).

**Pearson's Financial Condition at the Time of the Fires**

Pearson was unemployed at the time of the fires at her home. (*Id*. at 146-47, 171-72). The last job she held prior to the fire was at a local restaurant in the kitchen approximately three years prior to the fires. (*Id*. at 171-72; at 21 (EUO)). At the time of the second fire, Pearson was drawing Social Security benefits. (*Id*. at 183). According to Pearson's bank records, she received $1,514.00 each month. (*Id*.at 234; doc. 60-6 at 73). Pearson also received $300 a month from the rental of a home she owned in Dillon, South Carolina. (Doc. 60-5 at 183).

Pearson contends she received royalties from the use and sale of photographs taken by her late husband, Mr. Lettau. (*Id*. at 184). However, Pearson's bank statements for the months leading up to the fires contain no evidence of any income from this source. (*Id*. at 184, 242; doc. 60-6 at 26-86). Pearson also testified she received about $150,000 in death benefits from life insurance policies on Dr. Pearson and that she used all the money to pay the bills. (Doc. 60-5 at 201, 203-04). Pearson also testified she is a cosmetologist, and in the year 2009-2010 she made an annual income of roughly $12,000, but bank records do not corroborate this assertion. (*Id*. at 169-70, 178-79). At the time of the second fire, Pearson had no expectation to receive any other funds from any other source. (*Id*. at 195).

At the time of the fires, all of Pearson's bank accounts were with Wachovia. (Id. at 217). Pearson had a Money Market account. At the end of October 2009, Pearson withdrew $15,763.78, leaving only $365.83 in the account at the end of November 2009. (*Id*. at 224-25; doc. 60-6 at 23). The Money Market account balanced remained $365.83 at the time of the fires in April 2010. (Doc. 60-5 at 225-26; doc. 60-6 at 24).

Pearson's primary account was a Crown Classic account. (Doc. 60-5 at 226; doc. 60-6 at 25). A review of this account shows Pearson put the $15,763.78 she withdrew from her Money Market account into this account in October 2009. (Doc. 60-5 at

227-28; doc. 60-6 at 25-29). The balance of this account, Pearson's main bank account, was $9,073.68 at the end of November 2009. (Doc. 60-5 at 228; doc. 60-6 at 25-29). From December 2009 through September 2010, with exception of a deposit of $50,579.78 from an AARP life insurance policy from her deceased husband, the balance of this account steadily declined from a closing balance of $45,801.53 on February 24, 2010, to a closing balance of $25,009.06 on or about the date of the second fire, which decreased further to a closing balance of $3,179.53 on September 24, 2010. (Doc. 60-5 at 276; doc. 60-6 at 26-88).

On January 5, 2009, Wachovia sent the Pearsons a letter indicating their mortgage was in default for failure to pay several months of mortgage payments. (Doc. 60-5 at 482-84; doc. 60-6 at 99-100). Pearson contends they weren't behind on their mortgage, but nevertheless paid a $50,000 lump sum after Dr. Pearson passed away. (Doc. 60-5 at 484-85). Prior to the fires, Pearson attempted to refinance to reduce monthly mortgage payments, but did not go through with it. (Id. at 488-89). Additionally, in October 2009, Wells Fargo (previously Wachovia) noted a communication with the debtor, presumably Pearson since Dr. Pearson had died, regarding a possible loan modification. (Doc. 60-6 at 103-04).

In September 2009, CitiFinancial Corporation sued Pearson for an unpaid debt and obtained a default judgment against her for $10,000. (Doc. 60-5 at 551; doc. 60-6 at 183-84). Pearson testified she had no savings, investments, and no CDs at the time of the fires. (Doc. 60-5 at 135 (EUO)).

With respect to fixed expenses, Pearson's monthly expenses were in the range of $6,683 to $7,002.19 per month. (Doc. 60-1). Pearson also had to pay property taxes on March 1, 2010, in the amount of $896.49. (Doc. 60-5 at 246; doc. 606-6 at 26-84). Person admitted that, at the time of the fires, her monthly expenses exceeded her monthly income. (Doc. 60-5 at 204).

Pearson claims her previous husband, Mr. Lettau, left her a sizable estate, including cash, art, antiques, and photos. (Doc. 60-5 at 104-06). Pearson testified she spent the cash, including $50,000 as a down payment on the home that caught fire. (Id.).

Additionally, Pearson knew of an Alabama Department of Revenue state tax lien for the year 2007 for $2,467.10, with a notice dated August 29, 2009, (doc. 60-5 at 547; doc. 60-6 at 179), and a federal IRS tax lien against the home for $20,218.86, with a notice dated June 11, 2009. (Doc. 60-6 at 180).

Pearson claimed to have $150,000 cash in the home at the time of the second fire. (Doc. 60-5 at 61-64). Following the first fire, when asked if there was anything she wanted to retrieve, Pearson requested nothing from the home except a jug of coins. (Id.).

**April 19, 2010 Fire**

The week prior to the first fire, Pearson stayed with her daughter, Brittany Lettau ("B. Lettau"). (Doc. 60-5 at 301). On Friday, April 16, 2010, Pearson went to her home and met up with her friend Emily sometime early in the day. (*Id*. at 303-04). According to Pearson, she left her home after five o'clock that Friday evening, securing the home when she left. (*Id*. at 310, 314).

Pearson testified she returned to her home on Sunday, April 18, 2010, to make sure the water to her pool was turned off. (*Id*.at 332-33). Pearson stated she did not go in the house or garage, but simply walked outside to the pool to check the water. (*Id*. at 334). According to Pearson, she spent Sunday night at Brittany's house. (*Id*. at 339).

On April 19, 2010, the date of the first fire, Pearson returned to the house and entered through the garage door. (Doc. 60-5 at 341, 359). When Pearson entered the house on the main level, she heard water running and noticed "fallout" on the items in her house. (*Id*. at 359-60). When asked what she meant by "fallout," Pearson responded "ashes" and described seeing a thick layer of ashes when she walked through the main part of her house. (*Id.*). At this time, she called the fire department. (*Id*. at 366). Prior to the fire department arriving, Pearson stood outside the home; she did not walk through the house to determine if anything was damaged. (*Id*. at 366-67).

After surveying the scene of the first fire in the basement/storage area of the home, Fire Chief Potter opined the fire was possibly caused by an overturned lamp. (Doc. 60-17 at 21-23). He also concluded the fire melted PVC pipes which caused them to burst and the water to extinguish the fire. (*Id*. at 30). According to protocol, the fire department contacted the power company and had the power to the home turned off. (*Id*. at 34-35, 84). Additionally, to ensure there were no hot spots in the home, the fire department brought in a thermal imager to rule out any possible areas of heat to prevent rekindle. (*Id*. at 37). Fire Chief Potter walked through the home and ruled out any smoke or signs of fire. (*Id*. at 40). The home was secured by locking all doors. (*Id*. at 41). Fire Chief Potter told Pearson to have an electrician check out the wiring before having the power turned back on. (Doc. 60-17 at 77). Pearson stated she then went back to her daughter Brittany's home and never returned to her house. (Doc. 60-5 at 383).

**April 22, 2010 Fire**

The second fire at Pearson's home was discovered around 1:00 a.m. on Thursday, April 22, 2010 by neighbors who called 911. (Doc. 60-17 at 50). In responding to the second fire, the Rainbow City Fire Department arrived on scene to find the home "fully involved" in fire. (*Id*. at 51). Fire Chief Potter, who responded to both fires, went around the area of the home where the first fire occurred and saw no flames. (*Id*. at 55).

Later on Thursday, April 22, 2010, Pearson's daughter Brittany was contacted by the police, advising her Pearson's home had burned and asking Brittany where Pearson

was. (Doc. 60-7 at 65). Brittany then called Pearson while she was at the nail shop and informed her that her home caught fire. (*Id*. at 65; doc. 60-5 at 426-37).

### Investigation of the April 22, 2010 Fire

#### Fire Chief Potter

Fire Chief Potter ruled out a rekindle of the first fire as cause for the second fire because, in his experience, it was not possible to have a rekindle three days later, especially after a thermal imager was used to rule out hot spots. (Doc. 60-17 at 53, 56, 73). Additionally, when Fire Chief Potter examined the scene of the second fire, he noted the gas and power were turned off at the home. (*Id*. at 53). After eliminating a source or possible cause of the second fire by concluding there was no power source to the house, according to Fire Chief Potter, the second fire "became suspicious" as the circumstances were "not normal." (*Id*.at 63-64). Fire Chief Potter testified, based on ruling out other causes (a common method in fire investigation), in his opinion, "there was no accidental cause" for the second fire. (*Id*. at 69-70). Fire Chief Potter called in the county arson task force to further investigate the fire. (*Id*. at 66-67).

After his investigation, Captain Richard Johnson ("Johnson"), the investigator representing the task force, did not come to any conclusion regarding the cause of the fire, but testified "something had to have caused that second fire." (Doc. 74-1 at 26, 44). Johnson did not investigate motive or Pearson's financial status. (*Id*. at 9-16). This fire was Johnson's first fire investigation, and he testified he proved to himself he needs to be a "better investigator." (*Id*. at 90).

#### Rod Williams, EFI Global

Travelers retained Rod Williams ("Williams") with EFI Global to conduct an independent investigation to determine the origin and cause of the second fire. (Doc. 60-8 at 22-24). Williams is a Certified Fire Investigator, Certified Fire and Explosion Investigator, and Certified Vehicle Fire Investigator. (Doc. 60-9 at 19).

Among other items of investigation, Williams sent samples from the Pearson home to a forensic lab to be tested for ignitable liquids. (Doc. 60-8 at 85-86). These samples came back negative, which, in Williams' opinion did not conclusively mean ignitable liquids were not present on scene, only that ignitable liquids were not present in the sample taken. (*Id*.). Upon inspection of the scene, Williams himself detected the odor of gasoline. (*Id*. at 145). The Alabama State Fire Marshal, who also investigated the second fire, brought a K-9 accelerant detection dog to the scene, and the dog alerted on several locations within the confines of the home, indicating the possible presence of accelerant. (*Id*. at 146). No additional samples were taken from the areas on which the

dogs alerted. (Doc. 74-1 at 66).

On May 21, 2010, Williams prepared and submitted a thirty-day report to Travelers. (Doc. 60-1 at 31, 38-39). At the time, EFI Global provided clients with a written report within a thirty-day period. (*Id*. at 128). In this report, Williams opined the cause of the second fire was undetermined. (*Id*. at 67, Ex. 4 45-0 and doc. 60-9 at 1-18). Pearson contends this was a final report, but Travelers was not satisfied, so it asked Williams to continue to investigate. (Doc. 66 at 3, 5, 10).

After additional investigation, including witness interviews, Williams issued a supplemental report as part of the expert disclosures in this case on March 15, 2012, determining the cause of the second fire was "incendiary," meaning intentionally caused. (Doc. 60-8 at 59, 72). Pearson contends Travelers, dissatisfied with the results of the initial investigation, reopened the investigation and Williams changed his report based on speculation. (Doc. 66 at 3, 5, 10).

### Bob Boteler, Travelers

On April 24, 2010, Travelers referred the investigation of the second fire to Bob Boteler ("Boteler"), Fire Investigator with Travelers Fire Investigation Unit. (Doc. 60-11 at 3). Upon conclusion of his investigation, on December 15, 2010, Boteler issued a report entitled "Joann [sic] Pearson's Summarized Fire Investigation Notes," opining, in part, as follows:

> The second fire originated in the middle section of the residence and at this time my investigation indicates that it was the result of human intervention. Our investigation continues.

(*Id*. at 4, 19). On March 27, 2012, Boteler submitted his "Fire Investigation Report/Forensic Origin and Cause Determination" as part of the expert disclosures in this case. (*Id*. at 5). In conclusion, Boteler opined as follows:

> Fire patterns, witness accounts, and the fire dynamics indicate that the fire originated in the midsection of the structure. The cause of the fire in the middle section was the result of human intervention. Electrical causes, rekindle and lightning were affirmatively addressed and eliminated.

(*Id*. at 40).

### Additional Facts

According to Pearson's daughter, B. Lettau, on Wednesday, April 21, 2010, her mother left B. Lettau's house in the evening to go out and returned before midnight.

(Doc. 60-7 at 61-62).

Mark Butler ("Butler") lived next door to the Pearson home and is a reserve Sheriff's Deputy for Etowah County. (Doc. 60-12 at 9, 11). At the time of the second fire, Butler had a security camera system, with a security camera on his front porch providing a view of the Pearson home. (*Id*. at 40). According to Butler, on Wednesday evening, April 21, 2010, when he came home from work, he noticed Pearson's white truck in the driveway. (*Id*. at 47-48). Later, after he awakened due to the second fire, Butler noticed Pearson's white truck was no longer in the driveway. (*Id*. at 39, 47). Butler checked the recording on his security cameras after the second fire. (*Id*. at 41). Upon review of the tape recording, Butler observed that, prior to the second fire, a vehicle was driving down the street from the right side of his house to the left side. (*Id*.at 41, 46). Butler testified the cameras then showed a vehicle pulling out of Pearson's driveway shortly thereafter. (Id.). The next thing he recalls seeing on the tape was the fire. (*Id*. at 18-21). The tape was inadvertently taped over as part of Butler's camera system. (Doc. 60-12 at 40).

Don Garrett ("Garrett") is Butler's father-in-law. (Doc. 60-13 at 11). Garrett was at Butler's home on Wednesday, April 21, 2010, pressure washing Butler's deck. (*Id*. at 14). Garrett testified while he was there, he observed Pearson come in and out of her home carrying some pictures, "hand stuff," and lamps to the red Corvette. (*Id*. at 16). Pearson points out Garrett admitted his memory "comes and goes, according to [his] wife." (Doc. 62-6 at 32). Another neighbor, Susan Bishop, testified that prior to the fires, the Pearson home appeared as if no one was living there. (Doc. 60-14 at 16, 19, 30).

When asked about possible testimony regarding a gunshot or explosion prior to the second fire, Fire Chief Potter testified any such noise was not a relevant consideration in determining the cause of the second fire. (Doc. 60-17 at 75).

### Travelers' Investigation

Pearson's claim was assigned to Ted Alexander ("Alexander"), general adjustor with personal lines in the major case unit with Travelers. (Doc. 60-4 at 8, 16). Once Alexander received the assignment of Pearson's claims, he contacted Pearson via telephone, explained the claim process to her, made arrangements to inspect the loss, and inspected the loss. (*Id*. at 17-19). This was all completed prior to the first written reservation of rights correspondence to Pearson on April 30, 2010. (*Id*. at 58). Additionally, within the first thirty days, statements were secured from the fire investigation on circumstances surrounding the loss. (*Id*. at 26).

Immediately after the second fire, on April 23, 2010, Travelers issued a $7,500 check to Person for additional living expenses as provided for under the policy. (Doc. 60-5 at 458-59). Travelers continued to pay Pearson's additional living expenses until

February 18, 2011. (*Id*. at 478). Travelers also paid for the security and demolition of Pearson's property under the policy. (Doc. 60-4 at 68-69).

Alexander met with Pearson at least twice and spoke with her on the phone several times. (Doc. 60-5 at 463). Travelers also obtained an Examination Under Oath ("EUO") of Pearson as part of the investigation. (Docs. 60-5 at 143, et seq. & 60-6). As part of Traveler's process, the fire unit is responsible for determining or attempting to determine how a fire occurred. (Doc. 60-4 at 23). Within days of the second fire, Boteler, the Travelers' fire unit investigator, and Williams, an independent fire investigator, were assigned to the fire and were on site on April 26, 2010 to view the property. (Doc. 60-11 at 4, 14-19).

Alexander made his claim decision after consultation through a committee review process. (Doc. 60-4 at 23-24, 46). Travelers attempted to work with Pearson to obtain support for her claims of high value items, including art and collectibles, but, because Pearson did not know the value of many of her items, Alexander determined there was not adequate support for much of Pearson's claimed personal property. (*Id*. at 64). Pearson claims Travelers told her to use her best judgment. (Doc. 66 at 4).

On January 11, 2011, after its investigation into the fire loss, Travelers denied Pearson's claim and stated the reasons for the denial as follows:

> Our investigation revealed misrepresentations and/or concealment of material facts were made to us by you during the submissions, investigation and evaluation of the fire claim thereby breaching the Concealment of Fraud provision of the insurance contract. There is also evidence that you intentionally caused or procured this loss by arson, breaching the Intentional Loss provision of this policy.

(Doc. 60-6 at 96-98). Travelers determined Pearson made misrepresentations, including (among others) misrepresenting that she had not been back to the home after the first fire; misrepresenting her financial condition, and misrepresenting her possession of items on her inventory forms. (Doc. 60-4 at 61-64, 88, 110; at 32-37). Travelers conducted numerous meetings and conferences while evaluating Pearson's claim, including consulting with inside and outside counsel. (*Id*. at 42).

Pearson filed an appeal requesting Traveler's reconsider its decision, and Travelers denied the appeal. (Doc. 60-4 at 53-54).

Following the denial of Pearson's claim, Traveler's paid off Pearson's mortgage in the amount of $367,211.50, under the Mortgage Clause in the policy. (Doc. 60-5 at 478, 495). The Mortgage Clause states, in pertinent part, as follows:

12.   **Mortgage Clause**

\* \* \*

b.      If we deny your claim, that denial
will not apply to a valid claim of the
mortgagee.

(Doc. 60-2 at 32).

**Lettau Estate**

Pearson testified her late husband, Mr. Lettau, had a will and left everything to her as the sole beneficiary of his estate. (Doc. 60-5 at 99). She further testified the will was probated, but an inventory listing specifics as to the property she inherited was never done. (*Id*. at 99-102). Pearson stated, when Lettau passed away, all of his belongings were at their apartment or at his office studio in New Jersey. (*Id*. at 102-03). Pearson claims to have inherited Lettau's work (photographs), artwork, and "things. " (*Id*. at 106). The items and their corresponding values Pearson claims, as listed in her inventory claim forms to Travelers were, among other items: three Rembrandt Impressions, valued at $100,000; one Picasso lithograph, valued at $1,000,000; and one antique Tiffany's lamp from the 1800s, valued at $528,000. (*Id*. at 106, 110; doc. 60-6 at 111-59).

Pearson claims these items and other claimed items had been appraised at various times prior to the fires, but the documents burned in the house fire. (*Id*. at 117-18, 513-15). Pearson provided no documentation of Lettau's estate nor does she know how or from whom she should get any such documentation. (Doc. 60-5 at 206-07 (EUO)).

Diane Morelli, Lettau's daughter by a prior marriage, testified there was not much left after her father passed away. (Doc. 60-15 at 15, 23, 25). Morelli further testified, she was not aware of the existence of any of the pricey items Pearson claimed to have inherited from her father, (id. at 13, 19-25), and that her father was "always saying they didn't have much money." (*Id*. at 24). Morelli believed she would have known about any artwork her father had because she was very interested in art as a child and she and her father discussed art and visited museums together. (*Id*. at 13).

**Inventory Forms**

Pearson submitted inventory forms to Travelers listing "some" of the items that were in her home at the time of the fire. (Doc. 60-5 at 503; doc. 60-6 at 111-59). Pearson signed the bottom of every page of the inventory forms she submitted and testified everything on the forms was true. (Doc. 60-5 at 505-06). Pearson understood Travelers was relying on her submissions to determine how much money to pay on the claims. (*Id*.). Pearson claims she spoke with Alexander and explained she did not know the value of many of her items. (Doc. 66 at 5).

Pearson also testified her late husband, Dr. Pearson, had a friend who appraised some items, but she also cannot provide any information as to who this person is or where he is located. (Doc. 60-5 at 515).

On January 26, 2008, approximately two years before the fires, Travelers had a home appraisal done for the purpose of insuring the Pearsons' home. (Doc. 60-5 at 522-23; Doc. 60-6 at 159-78). Lee A. Kill of Cornerstone Appraisal did the appraisal at Traveler's direction. (Doc. 60-16 at 3). At the time Kill visited the home, he inspected the interior and exterior, interviewed Dr. Pearson, and took photographs. (*Id.*; doc. 60-5 at 522). No jewelry or other items, including the claimed Picasso, Rembrandts, and antique Tiffany lamp, listed on the claim forms, (doc. 60-6 at 114), appear on any of the appraiser's photographs, although Pearson claims she showed the items to Kill. (Doc. 60-5 at 523; doc. 60-6 at 159-78). Furthermore, as part of the appraisal report, there is a comprehensive risk analysis, with a number of questions and comments. (Doc. 60-16 at 6-9). Question 61, under the category "Additional Exposures" addresses personal property, listing "valuable fine art, jewelry, furs, or collectibles." (Id. at 8). Kill marked the box for "no" next to this question. (Id.).

At her EUO, Pearson presented a VHS video tape made by her cousin during a visit from New York at an unknown date prior to Dr. Pearson's death. (Doc. 60-5 at 160 (EUO)). None of the high value items listed in Pearson's inventory forms submitted to Traveler's can be seen in the video. (Doc. 60-6, at 302-08).

Pearson signed a proof of loss with Travelers swearing she had nothing to do with the fire, she did not cause the fire or retain someone else to cause the fire, she owned the items listed on the claim form, and the listed items were lost in the fire. (Doc. 60-5 at 472; doc. 60-6 at 94-95).

## III.   ANALYSIS

Travelers objects to the magistrate's recommendations to deny summary judgment on Pearson's breach of contract claim. More specifically, Travelers objects to the R&R's conclusion that material questions of fact remain concerning the applicability of two Policy terms, (1) the "Intentional Loss" Exclusion and (2) the "Concealment of Fraud" Condition, which are relevant to Pearson's performance under the contract. These objections will be addressed in turn.

## A.   The Determination that Material Questions of Fact Preclude Judgment on the "Intentional Loss" Exclusion Was in Error

In its motion for summary judgment, Travelers contends, "[a]ll the evidence illustrates that Pearson had means, opportunity and motive to commit the act of arson." (Doc. 60 at 37).

The magistrate judge wrote in the R&R,

questions of fact remain as to whether Pearson, or someone at her direction, caused the fire. . . . As this Court has previously explained, "[t]he fact that [the insurer] has produced evidence raising an inference that the insured willfully burned the property covered by the policy simply means there is sufficient evidence for the issue to go to the jury." *Auto Club Family Ins. v. Mullins*, No. 5:11-cv-1451-AKK, 2012 WL 6043652, at *6 (N.D. Ala. Nov. 29, 2012).

(Doc. 89 at 22). Travelers asserts that "there is ample, uncontradicted evidence of unexplained surrounding circumstantial evidence showing that the fire was caused by Pearson or at her direction." (Doc. 90 at 6). The evidence concerns Pearson's financial stress at the time of the fires, suggesting a motive for arson, and that Pearson alone "had the opportunity to set the fire or direct someone to set the fire." *Id*. This circumstantial evidence, Travelers contends, meets its burden of proof on the "Intentional Loss" exclusion.

In order to establish a case for arson, the insurer must show that "(1) the fire was intentionally set; (2) [the insured] had a motive for committing the alleged arson; and (3) [the insured] either set the fire or had it set, which may be proved by unexplained

surrounding circumstantial evidence implicating [the insured]." *Shadwrick v. State Farm Fire & Cas. Co.*, 578 So. 2d 1075, 1077 (Ala. 1991). Motive to commit arson can be deduced from an insured's financial difficulties and failed attempts to sell the house later burnt in the fire. *Id.* at 1078. That the insured either set the fire or directed it to be set can be proved by circumstantial evidence, including: that no one other than the insured and her family had access to the house, that the insured had been the last person inside of the house, and that there was no possibility of others having entered the house. *Id.* at 1078. If the undisputed evidence is sufficient to establish an affirmative defense of arson, a court can award summary judgment. *Quarles v. Nationwide Prop. & Cas. Ins. Co.*, 509 F. App'x 914, 915 (11th Cir. 2013).

For the first element, the evidence on record points unambiguously to the conclusion that the second fire, on April 22, 2010, was intentionally set. After the first fire, on April 19, the power to the home was turned off, and the fire department inspected the house to make sure that there was no risk of rekindle. Investigations by Fire Chief Potter, retained investigator Rod Williams, and Travelers' Fire Investigator Bob Boteler all concluded that the second fire was set intentionally after ruling out all other causes. Williams smelled gasoline in the house, and the Alabama State Fire Marshal's K-9 accelerant detection dog alerted to the possible presence of accelerants.

As to the second element, the record gives ample evidence of Pearson's financial

difficulties: she was unemployed, her monthly expenses significantly exceeded her income from Social Security benefits and a rental home, tax liens had been filed against her home, and a creditor had sued her for unpaid debt and obtained a default judgment. She had also tried to sell the house during 2009, but then took it off the market later that year after it failed to sell. A motive to commit arson was clearly established by Pearson's financial situation.

With regard to the third element, undisputed circumstantial evidence also shows that the second fire was caused by Pearson or at her direction. The only keys to the house were possessed by Pearson, her daughter, and possibly the real estate company that had previously listed the house. B. Lettau, her daughter, reported that Pearson left Lettau's house on the evening of the fire and came back before midnight. The fire was discovered around 1:00 AM that morning. In addition, neighbor Mark Butler reported seeing Pearson's truck on the night of the second fire, and after being awakened by the fire, seeing that her truck was gone. He also testified that his home security camera showed her truck backing out of the driveway shortly before the fire. Taken as a whole, the undisputed facts are sufficient to establish that the second fire was caused by Pearson or at her direction. Therefore, the court finds that all three elements for arson have been shown, establishing that Pearson violated the "Intentional Loss" exclusion in her policy.

## B.      The Determination that Material Questions of Fact Remain on the "Concealment of Fraud" Condition is in Error

In its motion for summary judgment, Travelers argued that "Pearson made material misrepresentations after this loss related to her involvement in the fire, Pearson's claim on the signed proof of loss, and the personal property inventory forms submitted by Pearson to Travelers." (Doc. 60 at 33).

The magistrate judge wrote in the R&R,

Although Travelers presents some evidence Pearson misrepresented or concealed certain material facts, there are questions of material fact, particularly regarding Pearson's intent to deceive, to preclude summary judgment. *Hillery v. Allstate Indem.* Co., 705 F. Supp. 2d 1343, 1359-60 (S.D. Ala. 2010) (citing *Murphy v. Droke*, 668 So. 2d 513, 517 (Ala. 1995) ("Where the plaintiff presents substantial evidence that the defendant had an intent to deceive, it is for the jury to decide whether the defendant actually had such an intent."); *State Farm Mut. Auto Ins. Co. v. Borden*, 371 So. 2d 28, 30 (Ala. 1979) ("Whether specific conduct constitutes an intent to deceive is a jury question.")).

(Doc. 89 at 24). Travelers objects to this conclusion, arguing that "there is no other conclusion that can be drawn other than that Pearson had intent to deceive when Pearson submitted, without any substantiation, that she owned three Rembrandt paintings, a Picasso lithograph, an antique Tiffany's lamp, and $150,000 in cash." (Doc. 90 at 7).

The policy at issue provides:

### SECTION I - CONDITIONS

\* \* \*

21

18. **Concealment of Fraud**. We provide coverage to
no "insureds" under this policy if, whether before
or after a loss, an "insured" has:
a. Intentionally concealed or misrepresented any material fact
or circumstance;
b. Engaged in fraudulent conduct; or
c. Made false statements;
related to this insurance.

Alabama law states, "No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy." Ala. Code 1975 § 27-14-28. The Alabama Supreme Court has explained the standard for inferring an intent to misrepresent from a false proof of loss: "a slight exaggeration of the amount of the value of the property destroyed will not defeat the claim entirely. To bar recovery, the overvaluation must be so extravagant as to lead to the conclusion that it was due not to a mistake in judgment but to an intention to defraud." *Hartford Fire Ins. Co. v. Clark*, 61 So. 2d 19, 27 (Ala. 1952).

The magistrate correctly notes that Alabama courts have set a high bar for a party to receive summary judgment when intent is at issue, generally preferring to leave it as an issue for the jury. *Hillery v. Allstate Indem.* Co., 705 F. Supp. 2d 1343, 1359-60 (S.D. Ala. 2010) (citing *Murphy v. Droke*, 668 So. 2d 513, 517 (Ala. 1995) ("Where the plaintiff presents substantial evidence that the defendant had an intent to deceive, it is for the jury to decide whether the defendant actually had such an intent."); *State Farm Mut.*

*Auto Ins. Co. v. Borden*, 371 So. 2d 28, 30 (Ala. 1979) ("Whether specific conduct constitutes an intent to deceive is a jury question."). However, Alabama law does not erect an absolute bar to finding intent at the summary judgment stage: when no material facts remain at issue with respect to the party's intent, summary judgment can be appropriate. *See*, *e.g.*, Kennamer v. Guide One Ins., 2012 WL 5426481*2-3 (N.D. Ala. 2012) (unreported) (granting summary judgment where party misrepresented in proof of loss that high-value items had been destroyed by house fire, when in fact the items had been safely kept in a storage unit off that property; the court inferred that the misrepresentations were intentional due to the "extravagant over-evaluations").

The court finds it significant that the strongest of the allegations of misrepresentation against Pearson are not, as in most Alabama cases dealing with misrepresentation by the insured, that she exaggerated the value of items that had actually been destroyed, but rather that she claimed ownership of items that never were present in the house, and possibly never owned by the insured or her first husband ("three Rembrandt Impressions, valued at $100,000; one Picasso lithograph, valued at $1,000,000; and one antique Tiffany's lamp from the 1800s, valued at $528,000" (doc. 60-5 at 106, 110; doc. 60-6 at 111-59)). In this sense, the misrepresentation is most similar to that of *Kennamer*, where the insured made claims for items following a house fire, but those items had actually been kept in a remote storage unit. 2012 WL

5426481*2-3.

In *Kennamer,* the court awarded summary judgment against the insured after she failed to rebut evidence by the insurer that she had made "extravagant over-evaluations" of her losses due to fire. *Id.* Importantly, the court inferred an intent to deceive from two facts: that the insured had motivation to deceive and that she had falsely listed expensive items in her proof of loss. *Id. at *1.* Other states have also reached the conclusion that an insured's claim for loss of nonexistent or undamaged items raises at least a strong presumption of intentional misrepresentation. *See, e.g., Home Ins. Co. v. Hardin*, 528 S.W.2d 723, 725 (Ky. 1975) ("a sworn proof of loss which includes numerous nonexistent items voids the entire policy as a matter of law"); *Saks & Co. v. Cont'l Ins. Co.*, 242 N.E.2d 833, 835 (N.Y. 1968) ("this presumption [of fraud] becomes conclusive where it is shown that the difference between the amounts claimed in the proof of loss and those actually proved to have been destroyed are grossly disparate and the explanation tendered is so unreasonable or fantastic that it is inescapable that  fraud has occurred"); *Mut. of Enumclaw Ins. Co. v. Cox*, 757 P.2d 499, 502 (Wash. 1988) ("there is ample evidence  from the trial record that [the insured] committed fraud by including numerous  items on his inventory list which were not at his Clear Lake house when the fire occurred"); *see also* 13 Couch on Ins. § 197:29.

In some cases dealing with insurance claims for nonexistent property, the court

found that the property had not been present on the basis of admissions by the insured. *Hardin*, 528 S.W. 2d at 724. In other cases, however, the court reached the conclusion that the claimed items were nonexistent not from the insured's admission, but rather from the failure to find signs of the items' existence and from suspicious conduct by the insured. In one case, the court relied on the fire investigators' inspection of the house, which did not find any traces of the items amidst the ashes, and the insured's lack of concern for the safety of supposedly high-value items after being told of the fire. *Saks*, N.E.2d at 835-36.   In another, the court found "ample evidence" for fraudulent misrepresentation because "some of these items claimed lost, such as jewelry and the bronze sculptures, should have been found during the sifting" of the aftermath of the fire. *Mutual of Enumclaw Ins. Co.*, 757 P.2d at 502. *See also Webb v. Am. Family Mut. Ins. Co.*, 493 N.W.2d 808, 809-11 (Iowa 1992) (upholding jury verdict of intentional misrepresentation by insured on grounds that several witnesses' testimonies, although inconsistent, justified inference that some of the claimed items were never present in the house destroyed by fire).

In this case, the evidence on record leads to the inevitable conclusion that Pearson claimed nonexistent items in her proof of loss. Those items included a work by Picasso (valued by Pearson at $1,000,000), three impressions by Rembrandt (valued at $100,000), and an antique Tiffany lamp (valued at $528,000).   During the home appraisal

that was conducted two years before the fires, the Pearsons did not tell the appraiser about any of the high-value items listed on the claim forms, and the appraiser checked the box for "no" in response to a question about the presence of "valuable fine art, jewelry, fur, or collectibles." Similarly, the photographs taken of the house during the appraisal show no indications of the items. Nor can the items be seen in a VHS tape recording of the interior of the Pearsons' house that was made by Pearson's cousin. Furthermore, the record shows it to be implausible that Mr. Lettau had ever acquired such expensive artwork.[2] Mr. Lettau's daughter by a prior marriage testified that she was not aware of her father owning any of the high-value items at issue, that she would have known about her father's acquisition of artwork in light of their shared interest in art, and that her father was "always saying they didn't have much money." Finally, Pearson had also claimed to have $150,000 in cash at the time of the second fire. However, after the first fire, when asked if she wanted to retrieve anything from the house, she asked only for a "jug of coins," showing no concern for that claimed cash. This conduct is highly inconsistent with the cash having been present in the house.

On her part, the plaintiff has only her own, unverifiable, testimony to show that she or her first husband Mr. Lettau ever owned the items that she listed on her proof of loss forms. Pearson has testified that these items had been appraised at various times, but that

---

[2] Pearson claims that she inherited these items from Mr. Lettau.

the appraisal documents were destroyed in the fire. She has also testified that the items were in Mr. Lettau's estate, but has not provided any documentation of the estate, and has said she does not know how to get documentation. No other witnesses have been able to testify to these items' existence, and there is none of the types of documentation that would be expected for unique, highly valuable artwork and collectibles.

After considering all of the undisputed facts, the court find the conclusion to be inescapable that the Picasso, Rembrandts, Tiffany lamp, and $150,000 in cash were not present in Pearson's house at the time of the fires. Travelers has presented "facts that would entitle it to a directed verdict if not controverted at trial," meeting its burden of proof as the moving party. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).   In response, Pearson has failed to produce "significant, probative evidence demonstrating the existence of a triable issue of fact" (*id.*)   as to the existence of the items in question.

Having concluded that misrepresentations as to the items' existence were made by Pearson following the fires, the court must also decide whether the misrepresentation was material and made with an intent to deceive. Ala. Code 1975 § 27-14-28. Since the values claimed for these nonexistent items added up to over $1.6 million, this misrepresentation undoubtedly is "material," as required by Ala. Code 1975 § 27-14-28. The claimed value of the nonexistent items is also relevant to the question of intent: a

sufficiently "extravagant" overvaluation of property losses is grounds for finding intent, while a "slight exaggeration" is not. *Hartford Fire Ins. Co. v. Clark*, 61 So. 2d 19, 27 (Ala. 1952). Falsely claiming such highly valuable, as well as unique (specifically the Picasso and Rembrandt artworks) items can only be described as "extravagant." Taking into account as well that Pearson's proof of loss was sworn under oath, the court concludes, as a matter of law, that her misrepresentation was intentional. Therefore, the court finds that the plaintiff violated the "Concealment of Fraud" Condition under her policy, and is not entitled to recover from Travelers for breach of contract on that alternative basis.

## IV.    CONCLUSION

Based on the foregoing, the objections will be **SUSTAINED** to the extent that they argue that there is no genuine issue of material fact disputing that the plaintiff committed arson and made intentional misrepresentations in violation of her insurance policy. Otherwise, the objections will be **OVERRULED**.   By separate order, summary judgment will be **GRANTED** to the defendant.

DONE and **ORDERED** this 18th day of September, 2014.


**VIRGINIA EMERSON HOPKINS**
United States District Judge

28